1  JULIE A. TOTTEN (STATE BAR NO. 166470)
   jatotten@orrick.com
2  ORRICK, HERRINGTON & SUTCLIFFE LLP
   400 Capitol Mall, Suite 3000
3  Sacramento, CA 95814-4497
   Telephone:    +1-916-447-9200
4  Facsimile:    +1-916-329-4900

5  MICHAEL D. WEIL (STATE BAR NO. 209056)
   mweil@orrick.com
6  ORRICK, HERRINGTON & SUTCLIFFE LLP
   The Orrick Building
7  405 Howard Street
   San Francisco, CA  94105-2669
8  Telephone:    +1-415-773-5700
   Facsimile:    +1-415-773-5759
9
   Attorneys for Defendants
10 INSTITUTIONAL TRADING CORPORATION (erroneously
   sued as "Institutional Trading Company") and IT.COM
11

12               UNITED STATES DISTRICT COURT

13              NORTHERN DISTRICT OF CALIFORNIA

14                 SAN FRANCISCO DIVISION

15

16 KWONG YUNG,                          Case No.  07-CV-5949

17           Plaintiff,                 **DECLARATION OF MARK A.
                                        CORDOVER IN SUPPORT OF
18      v.                              DEFENDANTS' MOTION TO
                                        DISMISS FOR LACK OF PERSONAL
19 INSTITUTIONAL TRADING COMPANY, a     JURISDICTION**
   corporation, IT.COM, a corporation, DOES 1
20 to 10,                               Date:        February 22, 2008
                                        Time:        10:00 a.m.
21           Defendant.                 Courtroom:   1, 17th Floor
                                        Judge:       Hon. Samuel Conti
22

23

24

25

26

27

28

I, Mark A. Cordover, declare as follows:

1.    I have personal knowledge of the matters contained in this declaration, except where such facts are stated to be based on information and belief and those facts I believe to be true. If called to testify to the matters set forth in this declaration, I could do so competently.

2.    I am the Chief Executive Officer of defendants Institutional Trading Corporation ("ITC") and IT.com.

3.    Defendant ITC is a privately held corporation, which was incorporated in the District of Columbia on October 27, 1983. ITC has its principal place of business in the District of Columbia. ITC has no offices in California. ITC does not have an agent for service of process in California. ITC does not lease or own real property in California. ITC does not have any bank accounts in California. ITC has no employees or officers residing in California. ITC does not conduct any directors' meetings or other corporate activity in California. At no time has ITC conducted business in California nor is ITC licensed to conduct business in California. ITC has no clients in California nor does it have contracts with any California individual or entities. ITC does not advertise in California. ITC does not have a Web site accessible to California residents. ITC does not have a telephone within California. ITC is not, and has never been, engaged in any litigation in California besides the instant matter brought by Mr. Yung and his related claim brought before the California Labor Commissioner.

4.    In late 2005, ITC transferred its trademark rights and other intellectual property to defendant IT.com. ITC retained ownership of the domain name IT.com. ITC does not employ anyone, and did not employ anyone during Mr. Yung's tenure.

5.    Defendant IT.com was incorporated in the District of Columbia on November 30, 2005. IT.com maintains its principal place of business in the District of Columbia. IT.com is a vertical search engine company that helps technology buyers find the best solutions available on the Web — objectively and comprehensively. Unlike directories that only include those vendors who have paid to be listed, or horizontal search engines that dredge the entire Internet with every search, IT.com's vertical engine delivers natural, relevant results focused exclusively on enterprise IT.

DECLARATION OF MARK A. CORDOVER IN
SUPPORT OF DEFENDANTS' MOTION TO DISMISS
CASE No. 07-CV-5949

6.     IT.com is not authorized to do business in California.  IT.com has no offices in California.  IT.com does not lease or own real property in California.  IT.com has no bank accounts in California.  IT.com has no employees or officers residing in California.  IT.com does not have a telephone within California.  IT.com does not advertise in California.  IT.com is not, and has never been, engaged in any litigation in California besides the instant matter brought by Mr. Yung and his related claim brought before the California Labor Commissioner.  IT.com has no current customers in California and has never had customers in California.  Since its inception, IT.com has solicited only three to four different entities in California to provide IT.com services, but IT.com has been unsuccessful in its solicitations.

7.     IT.com employed Mr. Yung from December 1, 2005 through December 12, 2006.  IT.com's first contact with Mr. Yung was in early to mid November 2005 when he responded to a job posting that IT.com had placed on Craig's List, a community based advertisement website.  IT.com listed the job posting *only* on the Washington, D.C. site at http://washingtondc.craigslist.org/ and the posting did only appear on the Washington, D.C. site.

8.     After Mr. Yung responded to the job posting, I conducted a screening interview with Mr. Yung on the telephone from my office in Washington, D.C.  I was impressed by Mr. Yung's qualifications, and IT.com paid for him to travel to Washington, D.C. for an in person interview about the job.  On or about November 11, 2005, Mr. Yung and I had a serious interview dinner at the Bangkok Bistro in Washington, D.C.  During this dinner, I offered Mr. Yung a position with IT.com, we negotiated the terms for his employment and we agreed on all the key terms of Mr. Yung's employment with IT.com.  We followed up and memorialized the terms over the next couple weeks through one or two emails.  I was in Washington, D.C. and I believe Mr. Yung was in California at the time of these follow-up emails.

9.     On Saturday, November 26, 2005, I memorialized the terms of Mr. Yung's employment in an email to Mr. Yung.  The email provided that Mr. Yung's employment would begin on Thursday, December 1, 2005.  I was located in Washington, D.C. when I sent the November 26, 2005 email.  Attached hereto as Exhibit A are emails exchanged between Mr. Yung and myself regarding the terms of Mr. Yung's employment.  Attached hereto as Exhibit B

- 3 -

1    is a true and correct copy of my November 26, 2005 email to Mr. Yung memorializing the terms

2    of his employment with IT.com.

3         10.    One of the terms of Mr. Yung's employment with IT.com provided that IT.com

4    would pay for some of Mr. Yung's expenses incurred in relocating from California to the

5    Washington, D.C. area in order for him to assume his position at IT.com.  IT.com also agreed to

6    reimburse Mr. Yung for expenses incurred for three visits to California for business reasons, only.

7    IT.com never agreed to employ Mr. Yung for a term of three years, or even for one year – his

8    employment was at will.

9         11.    Mr. Yung's first day of employment with IT.com was December 1, 2005 in

10   Washington, D.C.  Mr. Yung and IT.com entered into a Restricted Stock Agreement also on

11   December 1, 2005.  The agreement was signed by Mr. Yung in my office on that day.  There are

12   many changes to the agreement, which I initialed, and those constituted the only other negotiation

13   of Mr. Yung's employment contract.  This was done in my office in Washington, D.C..  Attached

14   hereto as Exhibit C is a true and correct copy of the Restricted Stock Agreement.

15        12.    Mr. Yung was employed by IT.com as a senior scientist.  Mr. Yung's

16   responsibilities included running IT.com's engineering efforts to improve and deepen IT.com's

17   vertical search technology and other technologies already being researched and developed.  He

18   was also responsible for managing the engineering team in these development efforts.  No

19   member of the engineering team that Mr. Yung managed was located or employed in California.

20        13.    I believe that Mr. Yung resided in the State of Virginia during his entire

21   employment with IT.com.  On many occasions during his employment with IT.com – including

22   weekends – I personally drove Mr. Yung to his home in Fairfax, Virginia.  Attached as Exhibit D

23   to this declaration is a true and correct copy of the Employment Eligibility Verification Form

24   filled out and signed by Mr. Yung on December 1, 2005, which identifies his address as Fairfax,

25   Virginia.  Attached as Exhibit E to this declaration is a true and correct copy of the Form W-4

26   completed and signed by Mr. Yung on December 9, 2005, which identifies his address as Fairfax,

27   Virginia.

28        14.    During Mr. Yung's employment, IT.com paid Virginia Income Tax Withholding

DECLARATION OF MARK A. CORDOVER IN
SUPPORT OF DEFENDANTS' MOTION TO DISMISS
CASE NO. 07-CV-5949

1  for his wages.  IT.com sent Mr. Yung's W-2 forms to his address in the State of Virginia.

2  Attached as Exhibit F to this declaration is a true and correct copy of Mr. Yung's W-2 for 2006.

3       15.    Mr. Yung was also employed in Washington, D.C. for the entire duration of his

4  employment with IT.com, and Mr. Yung performed all of his duties for IT.com in the

5  Washington, D.C. area.  I personally observed him at work in Washington, D.C. throughout his

6  employment, as his office was located directly next to mine throughout his employment with

7  IT.com.  I also had business lunches with him on no fewer than 20 occasions, all on Saturdays,

8  throughout his employment.

9       16.    Mr. Yung claims that he was not reimbursed for trips he claims were business

10  trips.  As part of his expense request, Mr. Yung attached two airline reservation confirmations.

11  Both list Mr. Yung's billing address as Fairfax, Virginia.  Attached as Exhibits G and H are true

12  and correct copies of these confirmations.

13       17.    I am informed and believe that Mr. Yung claims that, in the month of December

14  2005, he worked for IT.com in California.  That is not true.  Mr. Yung appeared in person in

15  Washington, D.C. on December 1, 2005 – which was his first day of work –  and I met with him

16  on this day.  I observed Mr. Yung at work in Washington, D.C. on every workday throughout the

17  month of December 2005.

18       18.    Mr. Yung's employment with IT.com had virtually nothing to do with anyone or

19  anything in California.  His expressed desire to travel to California was in order to keep up with

20  happenings in Silicon Valley, as Mr. Yung made one, or possibly two, business trips to California

21  during his employment.  Mr. Yung's other trips to California during his employment with IT.com

22  were for personal reasons.  On Mr. Yung's first IT.com-related trip to California, I accompanied

23  Mr. Yung to a continuing learning and research conference held at Stanford University and

24  sponsored by Yahoo!, Inc.  The conference lasted about one week.  On another occasion when

25  Mr. Yung already happened to be in California for a purported business trip – which turned out to

26  be a non-business-related trip – I asked Mr. Yung to meet a member of IT.com's advisory board,

27  who resides in the Bay Area.  The purpose of the meeting was simply a "get-to-know-you"

28  meeting.  There was no other business purpose for this meeting.

19.     I am aware that Mr. Yung claims to have traveled to California for business and claims to have seen his friends at Kosmix, Google and Microsoft during one or more additional trips to California. For example, on or about August 16, 2006, Mr. Yung sent an email to Belle Tseng at NEC-Labs to arrange a meeting. In the email, he describes himself as "the chief scientist of a small startup company in D.C., my hometown." Attached hereto as Exhibit I is a true and correct copy of the August 16, 2006 email Mr. Yung sent to Belle Tseng. None of these trips were authorized by me, or were on behalf of IT.com.

20.     I understand Mr. Yung claims that all persons and businesses with whom he had contact during his employment were in the Bay Area. That is incorrect. Mr. Yung has also submitted expense reports for one or more alleged business trips to Boston, Massachusetts. Mr. Yung, however, had the majority of his business contact with persons to whom I introduced him, here in Washington, D.C. This includes representatives of the United States Patent and Trade Office and the National Library of Medecine.

21.     Mr. Yung's employment was terminated for poor performance, unauthorized absences, and insubordination. I terminated his employment in person in IT.com's offices in Washington, D.C. on December 12, 2006. When Mr. Yung refused to leave after repeated demands that he do so, I called the police to escort Mr. Yung out of the office. Mr. Yung agreed to leave only after the police arrived.

22.     On February 16, 2007, Mr. Yung filed a claim with the Labor Commissioner of the State of California in the San Jose office for the Division of Labor Standards Enforcement. Mr. Yung's claim contained many of the same allegations that are asserted in this case: (1) alleged unpaid wages and (2) alleged unpaid business expenses for alleged business trips to California. Attached hereto as Exhibit J is a true and correct copy of Mr. Yung's Notice of Claim and Conference.

23.     On March 20, 2007, the Labor Commissioner issued its Notice – Investigation Completed. The Labor Commissioner dismissed the complaint for lack of jurisdiction. The Labor Commissioner expressly found that Mr. Yung's "work conducted in California was limited to irregular business or recruiting trips." The Labor Commissioner concluded that "Mr. Yung

1   does not have a sufficient basis to claim the protections of California law and should look to the

2   state of Virginia or the District of Columbia for assistance in resolving this dispute." Attached

3   hereto as Exhibit K is a true and correct copy of the Labor Commissioner's March 20, 2007

4   Notice – Investigation Completed.

5        24.    I understand that Mr. Yung has brought a claim for conversion of a laptop

6   computer. IT.com denies this claim. The laptop computer I believe Mr. Yung refers to in his

7   complaint is the laptop that IT.com issued to Mr. Yung for use to carry out his job duties at

8   IT.com and during the course of his employment. At all times the laptop was owned by IT.com.

9   This is true for the laptops IT.com issues all of its employees, and they understand as much.

10  When I terminated Mr. Yung's employment on December 12, 2006 at IT.com's office in

11  Washington, D.C., I took back the laptop computer from Mr. Yung. At all times relevant, the

12  laptop computer was in Washington, D.C.

13       25.    It would be a tremendous burden on ITC and IT.com to defend this lawsuit in

14  California. They are small companies, and personnel and money at both are at a premium. All of

15  IT.com's operations, employees, and potential witnesses reside in or near Washington, D.C. The

16  potential witnesses in this lawsuit include Mr. Yung's co-workers, including Jason Pratt, Andy

17  Liu, Seth Green,  IT.com's secretary, Coco Palomeque, and myself. Mr. Pratt, Mr. Lui, Mr.

18  Green, Ms. Palomeque, and I reside in the Washington, D.C. area. These witnesses could testify

19  about the terms of Mr. Yung's employment, his residence in Washington, D.C.,  and/or the facts

20  relating to Mr. Yung's breach of contract claim and wage claims, including about his poor job

21  performance.

22  //

23  //

24  //

25  //

26  //

27  //

28  //

DECLARATION OF MARK A. CORDOVER IN
SUPPORT OF DEFENDANTS' MOTION TO DISMISS
CASE NO. 07-CV-5949

26.     I understand that Mr. Yung claims that a former IT.com employee, Anthony DiFranco, is a "key witness" who happens to currently reside in California.  I disagree.  Mr. DiFranco was employed by IT.com in Washington, D.C. beginning in January of 2006.  After Mr. DiFranco's voluntary termination from IT.com, I understand that he moved to the Bay Area.  I do not believe he has any information about the reasons for Mr. Yung's termination, his wages or any other issue related to Mr. Yung's litigation.

I declare under penalty of perjury under that the foregoing is true and correct.

This declaration was executed in Washington, D.C. on January 4, 2008.

_____
Mark A. Cordover

# EXHIBIT A

Loading "Gmail – compensation summary"                                    03/20/2007 06:45 AM

 BETA

Kwong Yung <khyung@gmail.com>

## compensation summary
4 mensajes

---

**Kwong Yung <khyung@gmail.com>**                        **19 de noviembre de 2005 23:52**
Para: "Mark A. Cordover" <mark@it.com>

Hello Mark,

Below is the summary of our conversation Saturday 11/19 morning.
Contingent on the final offer letter, I plan to start work 12/01.

1) I shall receive 3% of IT.com over the course of 3 years.

2) I shall receive $110K in salary each year.

3) I shall travel to San Francisco Bay Area at least three times by April 2006.


Kwong Yung

---

**Mark A. Cordover <mark@it.com>**                        **20 de noviembre de 2005 8:21**
Para: Kwong Yung <khyung@gmail.com>

I agree, Kwong.  /mark
[El texto citado se encuentra oculto]

---

**Kwong Yung <khyung@gmail.com>**                        **21 de diciembre de 2006 8:24**
Para: khyung@yahoo.com

[El texto citado se encuentra oculto]

---

**Kwong Yung <khyung@gmail.com>**                        **21 de diciembre de 2006 8:24**
Para: khyung@yahoo.com

[El texto citado se encuentra oculto]

---

# EXHIBIT B



---

# Engagement Letter

mensaje

---

Mark A. Cordover <mark@it.com>                                    26 de noviembre de 2005 10:08
Para: Kwong Yung <khyung@gmail.com>

Kwong,

By this email I wish to confirm the following understanding between us as regards your employment at IT.com.

You shall begin work on or about December 1, 2005.  Your responsibilities will include running the engineering effort to improve and deepen the search technology and other technologies already underway.  In addition, I hope and expect substantial participation in the overall business challenges of developing and executing on our business.

You shall be granted immediately a 3% interest in a newly formed company called IT.com which shall have had transferred all of the intellectual property developed over the course of the last two years, and its attendant trademark rights etc, from within an older District of Columbia corporation called Institutional Trading Corp. for the entity known as IT.com.  The ownership of the domain name www.it.com shall remain with Institutional Trading Corp.  The value of the assets so transferred to IT.com shall be established as $100,000.00 and you will therefore be liable, from a tax perspective, for your pro rata share of that stock grant ($3,000.00).  There shall be a condition associated with this grant of stock which allows IT.com to repurchase all of the stock should you leave IT.com's employ within the first year, two-thirds of the stock should you leave between the first and second years, and one-third of the stock should you leave between the second and third years.  Thereafter IT.com will hold no right to repurchase your stock.

You shall be given a salary of $110,000.00 and granted the standard health insurance benefits (Blue Cross Blue Shield) with whom ITC and soon IT.com shall have a group policy.

IT.com shall cover some expenses of your move from California to DC as discussed by us and shall pay the expenses of your visiting California for business reasons at least three times (at your discretion) any time during the next calendar year.

I truly look forward to working with you.


Mark Cordover

CEO IT.com

# EXHIBIT C

# RESTRICTED STOCK AGREEMENT

THIS RESTRICTED STOCK AGREEMENT (this "Agreement") is made and entered into effective as of the 1st day of ~~January,~~ *December* 2005 (the "Effective Date"), by and between (i) IT.COM INC., a District of Columbia corporation (the "Corporation"), and (ii) KWONG YUNG ("Participant").

WHEREAS, as of the Effective Date, and in consideration for services performed and to be performed by Participant to the Corporation, the Corporation has issued to Participant, and Participant has acquired and received from the Corporation, thirty (30) shares of the Corporation's common stock [par value One Cent ($0.01) per share] (such shares, together with any all additional shares of common stock of the Corporation acquired by the Participant from time to time being referred to hereinafter referred to collectively as the "Shares"), at the aggregate acquisition cost equal to One Thousand Five Hundred Dollars ($1,500.00) [that is, Fifty Dollars ($50.00) per share]; and

WHEREAS, the parties hereto believes it is in the best interests of the Corporation and its other stockholder(s) to make provision for future dispositions of the Shares and certain other matters; and

WHEREAS, the parties hereto desire to set forth in writing their understandings and agreements with respect to the foregoing.

NOW, THEREFORE, in consideration of the foregoing, of the mutual promises hereinafter set forth and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending legally to be bound, do hereby agree as follows:

1. <u>Restrictions on Transfer of Shares</u>.  Except as otherwise expressly provided in this Agreement, no Shares may, without the prior written consent of the Corporation (which may be granted, denied and/or conditioned in the sole and absolute discretion of the Corporation), be sold, exchanged, delivered, assigned, bequeathed or gifted, pledged, mortgaged, hypothecated or otherwise encumbered, transferred or permitted to be transferred, or otherwise disposed of, whether voluntarily, involuntarily or by operation of law (including, without limitation, the laws of bankruptcy, intestacy, descent and distribution and succession).

2. <u>Mandatory Purchase of Shares Upon Termination of Employment During Three-Year Period</u>.

A.    In the event of the termination of employment of Participant with the Corporation during the three (3)-year period from and after the Effective Date hereof ~~for any reason whatsoever~~, including, without limitation, death, permanent disability, retirement, voluntary termination, involuntary termination, dismissal ~~with or without just cause~~, removal ~~with or without cause~~ or resignation, the Corporation ~~the Corporation~~ shall purchase (or shall cause its designee to Purchase) the "Applicable Percentage" (as defined below) of the Shares 

(including, if applicable, fractional Shares) of the Corporation owned by Participant and/or Participant's estate, executors or administrators, personal or legal representatives, and transferees (direct or indirect) set forth in this Section 2A below, at the purchase price and upon such other terms and provisions set forth in this Section 2 below.

B.    For all purposes of this Agreement, the term "Applicable Percentage" shall mean and refer to the following: (i) in the event that the date of termination of employment of Participant shall occur on or prior to the first anniversary of the Effective Date, the Applicable Percentage shall be equal to one hundred percent (100%); (ii) in the event that the date of termination of employment of Participant shall occur after the first anniversary of the Effective Date and on or prior to the second anniversary of the Effective Date, the Applicable Percentage shall be equal to sixty-six and two-thirds percent (66 2/3%); and (iii) in the event that the date of termination of employment of Participant shall occur after the second anniversary of the Effective Date and on or prior to the third anniversary of the Effective Date, the Applicable Percentage shall be equal to thirty-three and one-third percent (33 1/3%).

C.    The purchase price for Shares (or fraction thereof) to be purchased under this Section 2 shall be equal to Participant's acquisition cost per Share or fraction thereof (that is, Fifty Dollars ($50.00) per Share or fraction thereof).

D.    Settlement on the purchase of the Shares to be purchased by the Corporation (or its designee) under this Section 2 shall occur within thirty (30) days after the date of termination of employment, upon not less than ten (10) days written notice from the Corporation to Participant as to the settlement date, at the principal office of the Corporation or at such other place as the Corporation shall notify Participant. At settlement, Participant shall deliver to the Corporation (or its designee) the materials required pursuant to Section 4 hereof and, simultaneously therewith, the Corporation (or its designee) shall deliver to Participant cash or a good check in the amount of the purchase price of the Shares being purchased by the Corporation (or its designee) pursuant to this Section 2.

E.    Notwithstanding any other provision of this Agreement to the contrary, to the extent that there shall be a conflict between the provisions of this Section 2 and Section 3 hereof, the provisions of this Section 2 shall take precedence over the provisions of Section 3 hereof.

F.    (i)    Notwithstanding any other provision of this Agreement to the contrary, in the event of a "Change of Control" (as defined below) with respect to the Corporation, the provisions of this Section 2 shall automatically, and without further action, be of no further force or effect with respect to the termination of employment of Participant with the Corporation at any time from and after the occurrence of such Change of Control.

(ii)    For all purposes of this Agreement, the term "Change of Control" shall mean and refer to the occurrence of any of the following:

(a)    Any "Person" [which for the purpose of this Section 2(f) only has the meaning ascribed to such term in Section 3(a)(9) of the Securities Exchange Act of

1934, as amended (the "Exchange Act") and used in Sections 13(d) and 14(d) of the Exchange Act, including a "group" within the meaning of Section 13(d)(3) of the Exchange Act] has or acquires "Beneficial Ownership" (as defined below) of more than fifty (50%) percent of the combined voting power of the Corporation's then outstanding voting securities entitled to vote generally in the election of directors ("Voting Securities"); provided, however, that in determining whether a Change of Control has occurred, Voting Securities which are held or acquired by the following: (I) the Corporation or any of its "Related Companies" (as defined below) or (II) an employee benefit plan (or a trust forming a part thereof) maintained by the Corporation or any of its Related Companies (the persons or entities described in (I) and (II) shall collectively be referred to as the "Excluded Group"), shall not constitute a Change of Control. For purposes of this Agreement, "Beneficial Ownership" shall mean beneficial ownership within the meaning of Rule 13d-3 promulgated under the Exchange Act.

(b)    The individuals who are members of the "Incumbent Board" (as defined below) cease for any reason to constitute more than fifty (50%) percent of the Board of Directors of the Corporation.  For purposes of this Agreement, "Incumbent Board" shall mean the individual(s) who constitute the Board of Directors as of the Effective Date; provided, however, that for purposes of this definition, any individual who becomes a member of the Board of Directors subsequent to the Effective Date, whose election, or nomination for election by the Company's stockholders, was approved by a vote of at least two-thirds of those individuals who are members of the Board of Directors and who were also members of the Incumbent Board (or deemed to be such pursuant to this proviso) shall be considered as though such individual were a member of the Incumbent Board.

(c)    A consummation of a merger, consolidation or reorganization or similar event involving the Corporation, whether in a single transaction or in a series of transactions ("Business Combination"), unless, following such Business Combination:

(I)    the Persons with Beneficial Ownership of the Corporation, immediately before such Business Combination, have Beneficial Ownership of more than fifty (50%) percent of the combined voting power of the then outstanding voting securities entitled to vote generally in the election of directors of the corporation (or in the election of a comparable governing body of any other type of entity) resulting from such Business Combination (including, without limitation, an entity which as a result of such transaction owns the Corporation or all or substantially all of the Corporation's assets either directly or through one or more subsidiaries) [the "Surviving Company"];

(II)    the individuals who were members of the Incumbent Board immediately prior to the execution of the initial agreement providing for such Business Combination constitute more than fifty (50%) percent of the members of the board of directors (or comparable governing body of a noncorporate entity) of the Surviving Company; and

(III)    no Person (other than a member of the Excluded Group or any Person who immediately prior to such Business Combination had Beneficial Ownership of more than fifty percent (50%) of the then Voting Securities) has Beneficial

Ownership of more than fifty (50%) percent of the then combined voting power of the Surviving Company's then outstanding voting securities.

(d)   The assignment, sale, conveyance, transfer, lease or other disposition of all or substantially all of the assets of the Corporation to any Person (other than a member of the Excluded Group) unless, immediately following such disposition, the conditions set forth in Sections 2F(ii)(c)(I), (II) and (III) above will be satisfied with respect to the entity which acquires such assets.  For purposes of this Agreement, "Related Company" shall mean any entity that is directly or indirectly controlled by, in control of or under common control with the Corporation.

(e)   The occurrence of a liquidation or dissolution of the Corporation.

3.   Option to Purchase Shares Upon Termination of Employment.

A.   Subject to the provisions of Section 2 above, in the event of the termination of employment of Participant with the Corporation at any time ~~and for any reason whatsoever~~, including, without limitation, death, permanent disability, retirement, voluntary termination, involuntary termination, dismissal ~~with or without just cause~~, removal ~~with or without cause~~ or resignation, the Corporation shall have the option (but shall not be obligated), exercisable at any time by written notice to the Participant (or the executor, administrator, personal or legal representative, estate and/or transferee of the Participant), to purchase (or cause its designee to purchase) all or any part of the Shares owned by Participant and/or Participant's estate, executors or administrators, personal or legal representatives, and transferees (direct or indirect), at a purchase price equal to the "Fair Market Value" thereof (as determined in accordance with the provisions of Section 3C hereof) as of the calendar quarter immediately preceding the date of termination of employment, and subject to and in accordance with the other provisions of this Section 3 below.

B.   Settlement on the purchase of the Shares to be purchased by the Corporation (or its designee) under this Section 3 shall occur within sixty (60) days after the determination of the purchase price for such Shares (as determined in accordance with the provisions of Section 3C hereof), upon not less than ten (10) days written notice from the Corporation to Participant as to the settlement date, at the principal office of the Corporation or at such other place as the Corporation shall notify Participant.  At settlement, Participant shall deliver to the Corporation (or its designee) the materials required pursuant to Section 4 hereof and, simultaneously therewith, the Corporation (or its designee) shall deliver to Participant cash or a good check in the amount of the purchase price of the Shares being purchased by the Corporation (or its designee) pursuant to this Section 3.

C.   (i)   For all purposes of this Agreement, whenever it is necessary to compute the "Fair Market Value" of Shares of stock, such Fair Market Value of such Shares of stock shall be determined as follows:  If the selling stockholder (or, if applicable, his executors or administrators or personal or legal representatives) and the Corporation (and/or, if applicable, the purchasing stockholders) are able to reach mutual agreement as to such fair market value, such agreed value shall govern.  If mutual agreement cannot be reached, each of the selling

stockholder (or, if applicable, his executors or administrators or personal or legal representatives) and the Corporation (and/or, if applicable, the purchasing stockholders) shall promptly [but no later than fifteen (15) days after the date of written notice as to the exercise of the option under Section 3A above] appoint an appraiser to determine the fair market value for the selling Stockholder's Shares of stock for purposes of a cash sale. Any party hereto appointing an appraiser shall furnish the other parties hereto with written notice of the name, address and telephone number of such appraiser. The failure of any party entitled to appoint an appraiser to make such appointment within such fifteen (15)-day period shall constitute a waiver of such party's right to appoint an appraiser and the determination of the other party's appraiser shall be deemed to be the "Fair Market Value" for the Shares of stock, notwithstanding any other provision of this Section 3 to the contrary. If the two (2) appraisers agree upon the value of such Shares of stock, they shall jointly render a single written report of their opinion thereon. If the two (2) appraisers cannot agree upon the value of such Shares of stock, they shall each render a separate written report within thirty (30) days after their respective appointment as an appraiser and shall together, within thirty (30) days after the end of such thirty (30)-day period, appoint a third appraiser, who shall appraise such Shares of stock and shall render a written report of his or its opinion thereon. The agreed value or the value contained in the aforesaid joint written report or written report of the third appraiser, as the case may be, shall constitute the "Fair Market Value" of such Shares of Stock; provided, however, that if the value of such shares of Stock contained in the appraisal report of the third appraiser is more than the higher of the first two (2) appraisals, the higher of the first two (2) appraisals shall constitute the "Fair Market Value"; and, provided further, that if the value of such Shares of stock contained in the appraisal report of the third appraiser is less than the lower of the first two (2) appraisals, the lower of the first two (2) appraisals shall constitute the "Fair Market Value". All appraisers appointed shall be qualified by experience in the industry (industries) in which the Corporation does business and by their ability to appraise such Shares of stock The fees and other costs of each of the first two (2) appraisers shall be borne by the party appointing each such appraiser, with the fees and other costs of the third appraiser being shared equally by the two (2) parties.

(ii)    Any appraiser making any appraisal pursuant to this Section 3 shall assume an all-cash sale with respect to the Shares of stock to be sold and shall take into account any "control premiums", "minority ownership discounts" and/or "lack of marketability discounts" in valuing any such Shares of stock.

4.    <u>Delivery of Stock and Documents; General Provisions re Purchases</u>.

A.    Upon the closing of any purchase by the Corporation (and/or its designee) of any Shares pursuant to Sections 2 or 3 of this Agreement, Participant shall deliver to the Corporation (and/or its designee) the following: The certificate or certificates representing the Shares being sold, free and clear of all options, calls, contracts, commitments, demands, liens, encumbrances, pledges, charges and security interests, duly endorsed for transfer and bearing such documentary stamps, if any, as are necessary, and such assignments, certificates of authority, consents to transfer, instruments and evidences of title of Participant and of Participant's compliance with this Agreement as may be reasonably required by the Corporation (or by counsel for the Corporation).

B.    In the event that Participant is unable to, or for any reason does not, deliver to the Corporation (or its designee) the materials required pursuant to Section 4A hereof, duly endorsed and in accordance with the provisions of this Agreement, the Corporation (and/or its designee) may, in its sole discretion, deposit a check, or a check and promissory note (as the case may be), in the total amount of the purchase price for the Shares being purchased, as determined in accordance with Section 2 or 3 hereof, whichever is applicable, with any bank doing business within sixty (60) miles of the Corporation's principal executive office, or with the accountant or accountants then servicing the Corporation, as agent or trustee, or in escrow for Participant, to be held by such bank or accountant or accountants until withdrawn by Participant. Upon such deposit by the Corporation, Participant's Shares shall at such time be deemed to have been sold, assigned, transferred and conveyed to the Corporation (or its designee), and Participant shall have no further rights with respect thereto.

C.    For all purposes of this Agreement, including, but not limited to, Sections 2, 3, 4, 7, 9 and 10 hereof, any reference to Participant shall (when applicable) be deemed to be and include references to Participant's estate, executors or administrators, personal or legal representatives, and transferees (direct or indirect).

5.    <u>Employment of Participant</u>. Nothing in this Agreement shall be construed as constituting a commitment, guarantee, agreement or understanding of any kind or nature that the Corporation shall continue to employ Participant, nor shall this Agreement affect in any way the right of the Corporation to terminate the employment of Participant at any time ~~and for any reason~~. In the absence of an employment agreement, or of a provision in such an agreement to the contrary, Participant acknowledges that he is an employee at will.

6.    <u>Changes in Capital Structure</u>. The number of Shares held by Participant as well as the purchase price per Share set forth in Section 2 hereof shall be proportionately adjusted as required by law and in any manner resulting from (i) a division or combination of any of the shares of capital stock of the Corporation, (ii) a dividend payable in shares of capital stock of the Corporation, (iii) a reclassification of any shares of capital stock of the Corporation or (iv) any other change in the capital structure of the Corporation.

7.    <u>Sale or Other Disposition by Majority Interest</u>. Participant hereby irrevocably appoints the Corporation and its President, or either of them, as Participant's agents and attorneys-in-fact, with full power of substitution for and in Participant's name, to sell, exchange, transfer or otherwise dispose of all or a portion of Participant's Shares and to do any and all things and to execute any and all documents and instruments (including, without limitation, any stock transfer powers) in connection therewith, such power of attorney not to become operable until such time as the holder or holders of a majority of the issued and outstanding shares of common stock of the Corporation sell, exchange, transfer or otherwise dispose of, or contract to sell, exchange, transfer or otherwise dispose of, all or a majority of the issued and outstanding shares of common stock of the Corporation. Any sale, exchange, transfer or other disposition of all or a portion of Participant's Shares pursuant to the foregoing powers of attorney shall be made upon substantially the same terms and conditions (including sale price per share) applicable to a sale, exchange, transfer or other disposition of shares of common stock of the Corporation owned by the holder or holders of a majority of the issued and outstanding shares of common stock of

the Corporation. For purposes of determining the sale price per share of the Shares under this Section 7, there shall be excluded the consideration (if any) paid or payable to the holder or holders of a majority of the issued and outstanding shares of common stock of the Corporation in connection with any employment, consulting, non-competition or similar agreements which such holder or holders may enter into in connection with or subsequent to such sale, transfer, exchange or other disposition. The foregoing power of attorney shall not impose or be deemed to impose any fiduciary duty or any other duty (except as set forth in this Section 7) or obligation on either the Corporation or its President, shall be irrevocable and coupled with an interest and shall not terminate by operation of law, whether by the death, bankruptcy or adjudication of incompetency or insanity of Participant or the occurrence of any other event.

8.    Burden and Benefit. The terms and provisions of this Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto, their executors and administrators, estate, heirs, personal and legal representatives, successors and, subject to the restrictions on transfer set forth in this Agreement, transferees and assigns, direct and indirect, of the Shares.

9.    Notices. Any and all notices, requests or other communications hereunder provided for herein shall be given in writing and sent by hand delivery, by recognized overnight courier service or by registered or certified mail, return receipt requested, with first-class postage prepaid; and such notices shall be addressed: (i) if to the Corporation, to the principal office of the Corporation; and (ii) if to the Participant, to the address of such Participant as reflected in the records of the Corporation, unless notice of a change of address is furnished to all parties in the manner provided in this Section 9. Any notice which is required to be made within a stated period of time shall be considered timely if received (or delivery is refused) before midnight of the last day of such period.

10.    Specific Performance. The parties hereto agree that the Shares are unique, that Participant's failure to perform the obligations provided by this Agreement will result in irreparable damage to the Corporation and its stockholders and that specific performance of Participant's obligations may be obtained by suit in equity.

11.    Invalid or Unenforceable Provisions. The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

12.    Governing Law. This Agreement shall be construed and enforced in accordance with the laws of the District of Columbia (other than rules of conflicts-of-law or choice-of-law).

[Signatures Appear on Following Page]

IN WITNESS WHEREOF, the parties hereto have executed this Restricted Stock Agreement under seal as of the day and year first above written

ATTEST:

_____
Coco Palomeque, Secretary

[Corporate Seal]

CORPORATION:

IT.COM INC., a District of Columbia corporation

By: _____
        Mark A. Cordover, President

WITNESS:

_____

PARTICIPANT:

_____ (SEAL)
KWONG YUNG

-8-

# EXHIBIT D

U.S. Department of Justice
Immigration and Naturalization Service

OMB No: 1115-0136

**Employment Eligibility Verification**

Please read instructions carefully before completing this form. The instructions must be available during completion of this form. ANTI-DISCRIMINATION NOTICE: It is illegal to discriminate against work eligible individuals. Employers CANNOT specify which document(s) they will accept from an employee. The refusal to hire an individual because of a future expiration date may also constitute illegal discrimination.

**Section 1. Employee Information and Verification.** To be completed and signed by employee at the time employment begins.

| Print Name: Last | First | Middle Initial | Maiden Name |
|---|---|---|---|
| YUNG | KWONG | H | |

| Address (Street Name and Number) | Apt. # | Date of Birth (month/day/year) |
|---|---|---|
| 4427 ROCKCREST DR | | 01/12/1974 |

| City | State | Zip Code | Social Security # |
|---|---|---|---|
| FAIRFAX | VA | 22082-1821 | 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 |

I am aware that federal law provides for imprisonment and/or fines for false statements or use of false documents in connection with the completion of this form.

I attest, under penalty of perjury, that I am (check one of the following):
☑ A citizen or national of the United States
☐ A Lawful Permanent Resident (Alien # A_____
☐ An alien authorized to work until ___/___/___
(Alien # or Admission #)_____

| Employee's Signature | Date (month/day/year) |
|---|---|

**Preparer and/or Translator Certification.** (To be completed and signed if Section 1 is prepared by a person other than the employee.) I attest, under penalty of perjury, that I have assisted in the completion of this form and that to the best of my knowledge the information is true and correct.

| Preparer's/Translator's Signature | Print Name |
|---|---|

| Address (Street Name and Number, City, State, Zip Code) | Date (month/day/year) |
|---|---|

**Section 2. Employer Review and Verification.** To be completed and signed by employer. Examine one document from List A OR examine one document from List B and one from List C, as listed on the reverse of this form, and record the title, number and expiration date, if any, of the document(s)

| | List A | OR | List B | AND | List C |
|---|---|---|---|---|---|
| Document title: | PASSPORT | | | | |
| Issuing authority: | U.S. | | | | |
| Document #: | 208935589 | | | | |
| Expiration Date (if any): | 08/14/05 | | ___/___/___ | | ___/___/___ |
| Document #: | | | | | |
| Expiration Date (if any): | ___/___/___ | | | | |

CERTIFICATION - I attest, under penalty of perjury, that I have examined the document(s) presented by the above-named employee, that the above-listed document(s) appear to be genuine and to relate to the employee named, that the employee began employment on (month/day/year) 12/01/05 and that to the best of my knowledge the employee is eligible to work in the United States. (State employment agencies may omit the date the employee began employment.)

| Signature of Employer or Authorized Representative | Print Name SHOU PRATT | Title COO |
|---|---|---|
| Business or Organization Name IT.COM | Address (Street Name and Number, City, State, Zip Code) 1100 CONNECTICUT AVE, WASH, DC 20036 | Date (month/day/year) 12/1/2005 |

**Section 3. Updating and Reverification.** To be completed and signed by employer.

| A. New Name (if applicable) | | B. Date of rehire (month/day/year) (if applicable) |
|---|---|---|

C. If employee's previous grant of work authorization has expired, provide the information below for the document that establishes current employment eligibility.

| Document Title: | Document #: | Expiration Date (if any): ___/___/___ |
|---|---|---|

I attest, under penalty of perjury, that to the best of my knowledge, this employee is eligible to work in the United States, and if the employee presented document(s), the document(s) I have examined appear to be genuine and to relate to the individual.

| Signature of Employer or Authorized Representative | Date (month/day/year) |
|---|---|

Form I-9 (Rev. 11-21-91)N Page 2

# EXHIBIT E

# Form W-4 (2004)

**Purpose.** Complete Form W-4 so that your employer can withhold the correct Federal income tax from your pay. Because your tax situation may change, you may want to refigure your withholding each year.

**Exemption from withholding.** If you are exempt, complete only lines 1, 2, 3, 4, and 7 and sign the form to validate it. Your exemption for 2004 expires February 16, 2005. See Pub. 505, Tax Withholding and Estimated Tax.

**Note:** *You cannot claim exemption from withholding if: (a) your income exceeds $800 and includes more than $250 of unearned income (e.g., interest and dividends) and (b) another person can claim you as a dependent on their tax return.*

**Basic instructions.** If you are not exempt, complete the **Personal Allowances Worksheet** below. The worksheets on page 2 adjust your withholding allowances based on itemized

deductions, certain credits, adjustments to income, or two-earner/two-job situations. Complete all worksheets that apply. However, you may claim fewer (or zero) allowances.

**Head of household.** Generally, you may claim head of household filing status on your tax return only if you are unmarried and pay more than 50% of the costs of keeping up a home for yourself and your dependent(s) or other qualifying individuals. See line E below.

**Tax credits.** You can take projected tax credits into account in figuring your allowable number of withholding allowances. Credits for child or dependent care expenses and the child tax credit may be claimed using the **Personal Allowances Worksheet** below. See Pub. 919, **How Do I Adjust My Tax Withholding?** for information on converting your other credits into withholding allowances.

**Nonwage income.** If you have a large amount of nonwage income, such as interest or dividends, consider making estimated tax payments using

Form 1040-ES, Estimated Tax for Individuals. Otherwise, you may owe additional tax.

**Two earners/two jobs.** If you have a working spouse or more than one job, figure the total number of allowances you are entitled to claim on all jobs using worksheets from only one Form W-4. Your withholding usually will be most accurate when all allowances are claimed on the Form W-4 for the highest paying job and zero allowances are claimed on the others.

**Nonresident alien.** If you are a nonresident alien, see the Instructions for Form 8233 before completing this Form W-4.

**Check your withholding.** After your Form W-4 takes effect, use Pub. 919 to see how the dollar amount you are having withheld compares to your projected total tax for 2004. See Pub. 919, especially if your earnings exceed $125,000 (Single) or $175,000 (Married).

**Recent name change?** If your name on line 1 differs from that shown on your social security card, call 1-800-772-1213 to initiate a name change and obtain a social security card showing your correct name.

---

**Personal Allowances Worksheet (Keep for your records.)**

**A**  Enter "1" for **yourself** if no one else can claim you as a dependent . . . . . . . . . . . . . . . **A** ⎰ 1

**B**  Enter "1" if: { • You are single and have only one job; or
• You are married, have only one job, and your spouse does not work; or
• Your wages from a second job or your spouse's wages (or the total of both) are $1,000 or less. } . . **B** ⎰ 1

**C**  Enter "1" for your **spouse.** But, you may choose to enter "-0-" if you are married and have either a working spouse or more than one job. (Entering "-0-" may help you avoid having too little tax withheld.) . . . . . . **C** ____

**D**  Enter number of **dependents** (other than your spouse or yourself) you will claim on your tax return . . . . **D** ____

**E**  Enter "1" if you will file as **head of household** on your tax return (see conditions under **Head of household** above) . **E** ____

**F**  Enter "1" if you have at least $1,500 of **child or dependent care expenses** for which you plan to claim a credit . **F** ____
(**Note:** *Do not include child support payments. See Pub. 503, Child and Dependent Care Expenses, for details.*)

**G**  **Child Tax Credit** (including additional child tax credit):
• If your total income will be less than $52,000 ($77,000 if married), enter "2" for each eligible child.
• If your total income will be between $52,000 and $84,000 ($77,000 and $119,000 if married), enter "1" for each eligible child plus "1" **additional** if you have four or more eligible children. . . . . . . . . . . . . . **G** ____

**H**  Add lines A through G and enter total here. **Note:** *This may be different from the number of exemptions you claim on your tax return.* ► **H** 2

For accuracy, complete all worksheets that apply. {
• If you plan to **itemize or claim adjustments to income** and want to reduce your withholding, see the **Deductions and Adjustments Worksheet** on page 2.
• If you have **more than one job or are married and you and your spouse both work** and the combined earnings from all jobs exceed $35,000 ($25,000 if married) see the **Two-Earner/Two-Job Worksheet** on page 2 to avoid having too little tax withheld.
• If **neither** of the above situations applies, **stop here** and enter the number from line H on line 5 of Form W-4 below.
}

---

**Cut here and give Form W-4 to your employer. Keep the top part for your records.**

| | | | |
|---|---|---|---|
| Form **W-4** | **Employee's Withholding Allowance Certificate** | | OMB No. 1545-0010 |
| Department of the Treasury Internal Revenue Service | ► Your employer must send a copy of this form to the IRS if: (a) you claim more than 10 allowances or (b) you claim "Exempt" and your wages are normally more than $200 per week. | | **2004** |

**1** Type or print your first name and middle initial  KWONG H E  Last name  YUNG    **2** Your social security number  226  27  4554

Home address (number and street or rural route)  4427 ROCKCREST DR

**3** ☑ Single ☐ Married ☐ Married, but withhold at higher Single rate.
*Note: If married, but legally separated, or spouse is a nonresident alien, check the "Single" box.*

City or town, state, and ZIP code  FAIRFAX  VA  22032-1821

**4** If your last name differs from that shown on your social security card, check here. You must call 1-800-772-1213 for a new card. ► ☐

**5** Total number of allowances you are claiming (from line H above **or** from the applicable worksheet on page 2)  **5**  2

**6** Additional amount, if any, you want withheld from each paycheck . . . . . . . . . . .  **6** $

**7** I claim exemption from withholding for 2004, and I certify that I meet **both** of the following conditions for exemption:
• Last year I had a right to a refund of **all** Federal income tax withheld because I had **no** tax liability **and**
• This year I expect a refund of **all** Federal income tax withheld because I expect to have **no** tax liability.
If you meet both conditions, write "Exempt" here . . . . . . . . . . ► **7**

Under penalties of perjury, I certify that I am entitled to the number of withholding allowances claimed on this certificate, or I am entitled to claim exempt status.

Employee's signature
(Form is not valid unless you sign it.) ►  *Kwong H Yung*    Date ► 12/09/2005

**8** Employer's name and address (Employer: Complete lines 8 and 10 only if sending to the IRS.)    **9** Office code (optional)    **10** Employer identification number (EIN)

For Privacy Act and Paperwork Reduction Act Notice, see page 2.    Cat. No. 10220Q    Form **W-4** (2004)

# EXHIBIT F

| a Control No. | | b Employer identification number (EIN) 20-4202737 | | Void | | OMB No. 1545-0008 |
|---|---|---|---|---|---|---|
| c Employer's name, address, and ZIP code | | 1 Wgs. tips, other comp. 102051.03 | 2 Fed inc. tax withheld 20867.00 | 3 Social security wages 94200.00 | | Form **W-2** Wage and Tax Statement |
| IT.COM 1100 CONNECTICUT AVE.. NW SU WASHINGTON,  DC 20036-4136 | | 4 SS tax withheld 5840.39 | 5 Medicare wages & tips 102051.03 | 6 Medicare tax withheld 1479.74 | | **2006** |
| | | 7 Social security tips | 8 Allocated tips | 9 Advance EIC payment | | |
| d Employee's SSN 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 | | 10 Depdnt care benefits | 11 Nonqualified plans | 12a | | |
| e Employee's name, address, and ZIP code | Suff. | 13 Statutory employee . ☐ Retirement plan . . ☐ Third party sick pay . ☐ | 14 Other | 12b | | Copy D For Employer. |
| KHONG    YUNG 4427 ROCKCREST DR FAIRFAX,    VA 22032 | | | | 12c | | |
| | | | | 12d | | |
| 15 State VA | Employer's state ID No. 30-2042027376-001 | 16 State wages, tips, etc 102051.03 | 17 State income tax 5312.00 | 18 Local wages, tips, etc | 19 Local income tax | 20 Locality name |

OPMW26U  11/28/06

# EXHIBIT G

United Airlines – E-Ticket – Receipt and Itinerary                          07/13/2006 06:01 PM

# E-Ticket ˢᵐ Receipt and Itinerary

## YOUR ELECTRONIC TICKET WAS ISSUED

**This Document is for reference only**
Your electronic airline ticket is stored in our computer system.
As with all airline tickets, your electronic ticket is not transferable.
**Thank you for choosing United Airlines**

**Record Locator:** SXSH6W

| Party of (1) | Ticket Number | Mileage Plus # | Base Fare | Tax | Total |
|---|---|---|---|---|---|
| KWONG YUNG | 0162144343947 | 00886536615 | USD 0.00 | USD 5.00 | USD 5.00 |

Fare C13JUL06 WAS UA SFO 0.00XY UA WAS 0.00XY
Details: NUC0.00END ROE1.0 FARE USD 0.00 TAX 5.00AY TOT USD 5.00
Baggage Allowance - 2 pieces

Penalty: A SERVICE CHARGE MAY BE ASSESSED FOR ITINERARY CHANGES

**Total Number of Mileage Plus Miles Required:**    25000
**All taxes (including September 11th Security Fee):**    5.00

## Billing Information

Note: Bring a **PHOTO ID** to check-in.

Kwong Yung
4427 Rockcrest Dr
Fairfax, VA 22032-1821
khyung@alum.mit.edu

| Flight/Equip | Depart | Arrive | Seats (requested) | Class | Stops | Status |
|---|---|---|---|---|---|---|
| United Airlines 837 | Washington, DC (IAD) | San Francisco, CA (SFO) | 30C | Coach | Non- | Confirmed |

United Airlines – E-Ticket – Receipt and Itinerary

| | | | | | | |
|---|---|---|---|---|---|---|
| Boeing 757-200 | **Wed Jul 26 07:15** | CA (SFO) **Wed Jul 26 09:45** | 29C | Coach | stop | Confirmed |
| **United Airlines** 821 Airbus A320 | San Francisco, CA (SFO) **Mon Aug 07 23:30** | Washington, DC (IAD) **Tue Aug 08 07:34** | 15C | Coach | Non-stop | Confirmed |

**Issued** Thu Jul 13 14:58:00 2006 / CONXC

# EXHIBIT H

//// U N I T E D

| flyted.com >>>

# Reservation complete: See ticket details

**Ticket delivery**
Your ticket(s) will be delivered to you via E-Ticket

Your E-Ticket was issued. Please see below to print the e-receipt for your records. A confirmation
email will be sent to you shortly.

Your confirmation number is ZT5B9S

EasyCheck-in Online

**Total price: USD 110.30**

View price breakdown
View fare rules

Wed, Dec 06, 2006 - IAD to BOS

| United 0860 | Depart: IAD 08:45 AM<br>Arrive: BOS 10:16 AM | Non-stop<br>1h 31m<br>319<br>413 miles traveled | Fare basis code:<br>SAUNI<br>Booking class: S<br>Economy<br>500 Award miles<br>No Meal Service | 13A<br>Download to calendar |

PenaltyCXL BY FLT DATE OR NOVALUE
NONREF/CHG100PLUSFAREDIF/

**Additional information: Check-in information**
Please note that valid, government-issued photo identification must be presented at check-in.

View printable e-receipt    Create new itinerary    Go to EasyUpdate    Flight paging alert

**Passenger(s)**

| Name | Kwong Yung | | Flight | Seat |
|------|-----------|--|--------|------|
| Type | Adult | | 0860 | 13A |
| Mileage Plus number | 00886536615 | | | |
| Email | khyung@yahoo.com | | | |
| Phone | 7034257756 | | | |

## Featured promotion

**Special Hertz promotion**

As a thank you for purchasing your flight on united.com, you've earned $50 off a qualifying car
rental of 5 days or more with Hertz. Redeem your gift now, or if you're not ready to book your car
rental just yet, save this link and visit Hertz before February 28, 2007.

Purchase hotels

United Airlines – Confirmation

02/23/2007 06:23 PM

## ///// U N I T E D ● C O M ●

Thank you for booking at united.com where you'll always enjoy:

- United's guaranteed lowest fares Learn more.
- No booking fees
- Bonus miles when you book online Learn more.

**Payment details**
MPVISA   xxxxxxxxxx7570       USD 110.30

         Expiration date 0110

**Billing / Delivery Information**
Kwong Yung
4427 Rockcrest Dr
Fairfax
VA 22032-1821
USA

United Airlines Contract of Carriage.

# EXHIBIT I


BETA

# ocial networks from email

mensajes

wong Yung <khyung@gmail.com>
ara: belle@sv.nec-labs.com, belle@alum.mit.edu

16 de agosto de 2006 14:02

http://www.nec-labs.com/research/internet/internet-project-AIKO.shtml

Hello Belle Tseng,

I found you through the above webpage. The second article about CommunityNet
appears quite interesting because it mentions both LDA and social
networks. Could you please send me a copy of the research paper?

You and I last spoke two years ago in 2004, when I interviewed at NEC
Labs in Cupertino. I joined IBM Almaden Research Center to work with
Rakesh Agrawal on privacy and data mining. Since then the group
largely disbanded because two top engineers left for Google. Even
Rakesh Agrawal himself now leads Microsoft's new Search Lab in
Mountain View.

Like you, I left IBM Research for more exciting opportunities. Now I
am the chief scientist of a small startup company in DC, my hometown.

Kwong Yung

2. Predicting Personal Information Dissemination Behaviors with
CommunityNet: Content-Time-Relationship Model

[X. Song, C.-Y. Lin, B. L. Tseng and M.-T. Sun, "Modeling and
Predicting Personal Information Dissemination Behavior," ACM SIGKDD
International Conference on Knowledge Discovery and Data Mining, Aug.
2005.]

A new way to automatically model and predict human behavior of
receiving and disseminating information is proposed by analyzing the
contact and content of personal communications. A personal profile,
called CommunityNet, is established for each individual based on a
novel algorithm incorporating contact, content, and time information
simultaneously. It can be used for personal social capital management.
Clusters of CommunityNets provide a view of informal networks for
organization management. Our new algorithm is developed based on the
combination of dynamic algorithms in the social network field and the
semantic content classification methods in the natural language
processing and machine learning literatures. We tested CommunityNets
on the Enron Email corpus and report experimental results including
filtering, prediction, and recommendation capabilities. We show that
the personal behavior and intention are somewhat predictable based on
these models. For instance, "to whom a person is going to send a
specific email" can be predicted by one's personal social network and
content analysis. Experimental results show the prediction accuracy of
the proposed adaptive algorithm is 58% better than the social
network-based predictions, and is 75% better than an aggregated model
based on Latent Dirichlet Allocation with social network enhancement.
Two online demo systems are developed that allow interactive
exploration of CommunityNet.

Belle Tseng <belle@sv.nec-labs.com>
Para: Kwong Yung <khyung@gmail.com>

17 de agosto de 2006 12:53

# EXHIBIT J

*Direct any correspondence to:*
**LABOR COMMISSIONER, STATE OF CALIFORNIA**
Department of Industrial Relations
Division of Labor Standards Enforcement
100 Paseo de San Antonio, Ste. 120
San Jose, CA 95113
FAX(408) 277-9643

PLAINTIFF:   **Kwong Yung**

DEFENDANT:   **Institutional Trading Corporation; IT.COM Inc.**
            **1100 Connecticut Avenue, #310**
            **Washington DC 20036-4136**

| State Case Number | |
|---|---|
| **12-67662    JH** | **NOTICE OF CLAIM AND CONFERENCE** |

**ALL PARTIES** in the above matter **ARE TO APPEAR** for a conference to be held in the Office of the State Labor Commissioner as follows:

**PLACE:**   100 Paseo de San Antonio, Ste. 120 San Jose, CA 95113

**DATE:**   Tuesday, March 20, 2007          **TIME:**   9:45 AM

The purpose of this conference is to discuss the validity of and to settle the claim filed with this Division by the Plaintiff shown above alleging non-payment of :

Issue 1: Wages for the period Decennmber 1, 2006 to December 31, 2006 being
            1 month at $9,166.67 per month, claiming $9,166.67.
Issue 2: Travel Expenses: $7,608.40; employer will itemize and show them at the
            conference.

☒ and also alleging additional wages accrued pursuant to Labor Code Section 203 as a penalty at the rate of  $423.08............
    per day until paid, but not exceed thirty days.

☐ and also alleging additional wages accrued pursuant to Labor Code Section 203.1, as a penalty at the rate of ...........................................
    per day for issuance of an insufficient payroll check for an indeterminate number of days not to exceed thirty days.

In addition, the Defendant may be subject to penalties due to the State of California, pursuant to Labor Code Section 210.
**ALL PARTIES** please bring any supporting material you
have, including books, payroll records, time records or
other documents that may have bearing on this matter.

**TO THE DEFENDANT:**

Prior to the conference, you may submit to this office a written
reply regarding this claim.  However, you should still attend the
conference, unless otherwise notified.

If this matter is not settled at the conference, a hearing may be
scheduled.  Any wages awarded as a result of a hearing pursuant
to Labor Code Section 98 will accrue interest from the date they
are found due until they are paid {Labor Code Section [98.1(c)].

Instead of appearing for the above conference you can settle
this claim by mailing **immediately** to this office a check or
money order made payable to the **Plaintiff** for the full amount
of the claim, **including penalties.**  If you concede that part of
the claim is valid the conceded amount **must be paid
immediately** as required by Labor Code Section 206.

Any disputed amount will be discussed at the scheduled
conference.  Payment must be accompanied by a separate or
detachable itemized statement of any deductions made, as
provided by the Labor Code.  Do not make payroll deductions
from amounts paid as penalties.

**If this claim is not settled, it will be resolved as provided by Section 98 of the Labor Code.**

DATED: February 16, 2007                                    *Joan Healy*

                                    **Joan Healy**            *Deputy Labor Commissioner*
                                    408-277-9642

DLSE 563/DEF.  (REV9/96)        NOTICE OF CLAIM AND CONFERENCE                    L.C. 98

# EXHIBIT K

Direct any correspondence to:
**LABOR COMMISSIONER, STATE OF CALIFORNIA**
Department of Industrial Relations
Division of Labor Standards Enforcement
100 Paseo de San Antonio, Ste. 120
San Jose, CA 95113
 FAX(408) 277-9643



**PLAINTIFF:**

 Kwong Yung

**DEFENDANT:**  Institutional Trading Corporation; IT.com Inc.
  1100 Connecticut Avenue, #310
  Washington DC 20036-4136

| State Case Number | |
|---|---|
| **12-67662  JH** | **NOTICE - INVESTIGATION COMPLETED** |

We have completed our investigation of the complaint made by the plaintiff shown above.

This is to advise you that no further action is contemplated by this office and we are closing our file.

The parties presented evidence that clearly showed Mr. Yung was a resident of Virginia in 2006. There was no documentation provided that Mr. Yung was a resident of California for any time in 2006; his W-2 statement from the defendant for 2005 and 2006 shows a Fairfax, Viriginia address, the same address is indicated on his 2005 W-2 statement from IBM, the W-4 statement, the I-9 form, Blue Cross enrollment form and other documents.  In an email dated August 16, 2006 and sent to Belle Tseng at NEC Labs, Mr. Yung identified himself as the chief scientist for a startup company in his hometown Washington, DC. The travel reimbursement requests include amounts for lodging, meals and rental cars further establishing that Mr. Yung was not a resident of this state.  The work conducted in California was limited to irregular business or recruiting trips, and it did not establish the type of presence in the state to provide Mr. Yung the protections of California law.  Finally, Mr. Yung relies on an employment 'contract' apparently negotiated by email to establish that the contract was entered into in California.  However, Mr. Cordover was in Washington DC while the contract was finalized, not California.  Furthermore, the express terms of this agreement indicate that Institutional Trading Corporation would reimburse some of the moving expenses for Mr. Yung to move to the Washington DC area for this job.  Under these circumstances, Mr. Yung does not have a sufficient basis to claim the protections of California law and should look to the state of Virigina or the District of Columbia for assistance in resolving this dispute.

STATE LABOR COMMISSIONER

Date: 3/20/2007

Joan Healy                    *DEPUTY LABOR COMMISSIONER*
408-277-9642