UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

--------------------------------------------------------

KWONG YUNG,  :  CASE NO. 1:08-CV-662

        Plaintiff, :

vs.  :  OPINION AND ORDER
   :  [Resolving Doc. No. 34]

INSTITUTIONAL TRADING  :
COMPANY, *et al.*,  :
   :
        Defendants. :

--------------------------------------------------------

JAMES S. GWIN,[1/] UNITED STATES DISTRICT JUDGE:

In this breach of employment contract case, the Defendants Institutional Trading Company and IT.com move for summary judgment against their former director of research Plaintiff Kwong Yung. [Doc. 34.] With his Complaint, Plaintiff Yung brings claims against the Defendants for breach of his employment contract, failure to pay wages, conversion of a laptop computer, and fraud. [Doc. 1 at 10.]

For the following reasons, the Court **GRANTS IN PART** and **DENIES IN PART** the Defendants' motion for summary judgment.

**I. Background**

This case arose after Defendant IT.com, a technology company, fired Plaintiff Kwong Yung on December 12, 2006. Before firing Yung, Defendant IT.com employed him as director of research

---

[1/] The Honorable James S. Gwin of the United States District Court for the Northern District of Ohio, sitting by designation.

-1-

Case No. 1:08-CV-662
Gwin, J.

and chief scientist. According to Yung, his termination violated a three-year employment contract. Yung also alleges that IT.com has refused to pay him wages for his final month of employment, refused to reimburse him for travel expenses, and refused to return a laptop computer he used at work.

In 1983, Mark Cordover founded Defendant Institutional Trading Company, a private investment company. [Doc. 34-3 at 2.] In 2005, Cordover created Defendant IT.com, a start-up technology company based in Washington, D.C. [*Id.*] In staffing the new company, Cordover interviewed and ultimately hired Plaintiff Yung to work as IT.com's director of research.[2/] [Doc. 34-3 at 2-3.] Cordover hired Yung, who holds a Ph.D. from Stanford University in statistics and machine learning, to help engineer a vertical search engine for the company. [Doc. 34-3 at 2, 34-5 at 13.]

Between November 18, 2005, and November 20, 2005, Cordover and Plaintiff Yung negotiated Yung's employment terms. [Doc. 34-5 at 14-16.] On November 26, 2005, Cordover sent Yung an Engagement Letter, formally offering him a position with the company. [Doc. 34-5 at 13.] According to this letter, Yung would receive a three percent ownership interest in IT.com. [Doc. 34-5 at 13.] The Engagement Letter, however, also gave the company the right to:

> [R]epurchase all of the stock should [Yung] leave IT.com's employ within the first year, [repurchase] two-thirds of the stock should [Yung] leave between the first and second years, and [repurchase] one-third of the stock should [Yung] leave between the second and third years. Thereafter, IT.com will hold no right to repurchase [Yung's] stock.

[Doc. 34-5 at 13. ]

Second, the Engagement Letter stated that IT.com would: "pay the expenses of your visiting California for business reasons at least three times (at your discretion) any time during the next

---

[2/] At times, the parties and evidence refer to Yung as IT.com's "Chief Scientist."

-2-

Case No. 1:08-CV-662
Gwin, J.

calendar year." [Doc. 34-5 at 13.] Ultimately, Plaintiff Yung accepted the offer and moved from California to Washington, D.C., to begin work at IT.com.

On Yung's first day with the company, December 1, 2005, he signed a Restricted Stock Agreement. [Doc. 34-5 at 4-11.] This agreement required Defendant IT.com to repurchase Yung's shares on a pro rata basis if he left the company within his first three years. [Doc. 34-5 at 4.] The agreement also stated:

> Nothing in this Agreement shall be construed as constituting a commitment, guarantee, agreement or understanding of any kind or nature that the Corporation shall continue to employ [Yung], nor shall this Agreement affect in any way the right of the Corporation to terminate the employment of [Yung] at any time. In the absence of an employment agreement, or of a provision in such an agreement to the contrary, [Yung] acknowledges that he is an employee at will.

[Doc. 34-5 at 9.] On January 1, 2006, Cordover gave Yung a stock certificate transferring thirty shares of IT.com stock to Yung. [Doc. 34-5 at 2.]

A few months later, IT.com purchased three laptop computers and provided one to Plaintiff Yung. [Doc. 34-3 at 3, 7.] The parties dispute whether IT.com gave Yung the computer outright or merely permitted him to use it for work. [Doc. 34-3 at 3, 39-1 at 2.] In support of his claim that IT gave him the laptop, Yung says that he put personal files and software he had purchased on the computer. [Doc. 39-1 at 1.] On December 11, 2006, Cordover confiscated the laptop from Yung. [Doc. 39-1 at 1.]

During his employment, Yung submitted one travel reimbursement request to Defendant IT.com. [Doc. 34-4 at 44.] IT.com paid Yung the full $3,692.11 he requested. [Doc. 34-3 at 13-15.] Plaintiff Yung says that he took several other trips in 2006 at a cost of $7,608.40 but did not submit reimbursement requests to IT.com. [Doc. 34-4 at 44.]

On December 10, 2006, more than a year after Yung joined the company, Cordover placed Yung on two weeks probation, apparently because Yung had spent time on what Cordover believed to be unnecessary projects and had unexplainedly left the office for extended periods of time. [Doc. 39-7.] Two days later, December 12, 2006, Cordover fired Yung. [Doc. 34-4 at 10.]

According to Yung, later on December 12, 2006, he and Cordover orally agreed that Yung would write up the details of a key mathematical algorithm he had developed for IT.com in exchange for "payment of wages through December 31, 2006, and my computer." [Doc. 39-1 at 2.] Yung says he worked on the algorithm summary for the next week and gave it to Cordover on December 19, 2006. [Doc. 39-1 at 2.] Yung claims that Cordover then asked him to sign an Employment Separation Agreement containing what Yung viewed as unfavorable terms. [Doc. 39-1 at 2.] Yung thus refused to sign. [*Id.*]

On September 28, 2007, Plaintiff Yung sued the Defendants in San Francisco Superior Court. [Doc. 1 at 8.] In his Complaint, Yung claimed that the Defendants breached his employment contract by terminating him without cause, not paying his full December 2006 salary, and not reimbursing him $7,608.40 in travel expenses. [Doc. 1 at 10.] Yung also made claims for unpaid wages, conversion of the laptop computer, and fraud. [Doc. 1 at 10-12.]

On November 26, 2007, the Defendants removed the case to the U.S. District Court for the Northern District of California. [Doc. 1 at 1.] On April 14, 2008, the district court granted the Defendants' motion to transfer the case to this Court. [Doc. 18.] Finally, on March 16, 2009, the Defendants filed the instant motion for summary judgment. [Doc. 34.] The Plaintiff has responded, [Doc. 39], and the Defendants have replied. [Doc. 41.] Accordingly, the motion is ripe for ruling.

## II. Legal Standard

Case No. 1:08-CV-662
Gwin, J.

Summary judgment is appropriate when "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

A defendant moving for summary judgment has the initial burden of showing the absence of a genuine factual issue with respect to one or more essential elements of the plaintiff's claim. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). The moving defendant meets his burden by "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which [he] believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323 (quoting Fed. R. Civ. P. 56(c)). However, the moving defendant is under no "express or implied" duty to "support [his] motion with affidavits or other similar materials negating the opponent's claim." *Id.*

Once the moving defendant satisfies his burden, the burden shifts to the nonmoving plaintiff to set forth specific facts showing a triable issue. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). The nonmoving plaintiff may not defeat the summary judgment motion merely by showing some existence of doubt as to the material facts. *See id.* at 586. Nor can the nonmoving plaintiff rely upon the mere allegations or denials of her pleadings. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court views the factual evidence and draws all reasonable inferences in favor of the nonmoving plaintiff. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970). To be sure, the Court need not conclusively resolve an allegedly disputed issue in favor of the nonmoving plaintiff; rather, the plaintiff must present "sufficient evidence supporting the claimed factual dispute . . . to require a jury or judge to resolve the parties' differing versions of

the truth at trial." *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 288-89 (1968). Ultimately the Court must decide "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

### III. Analysis

In moving for summary judgment, the Defendants largely argue that Plaintiff Yung can provide no evidence in support of any of his four claims for relief.

As an initial matter, however, the Court finds no evidence that Defendant Institutional Trading Company employed Plaintiff Yung. The Court also finds no evidence that ITC owed Yung wages, unlawfully retained his laptop, or defrauded him. Instead, as the Plaintiff's memorandum in opposition implicitly recognizes, all of the evidence in this case indicates that he contracted and ultimately dealt only with Cordover and Defendant IT.com. Accordingly, the Court **GRANTS** summary judgment to Defendant Institutional Trading Company on all of Plaintiff Yung's claims.

The Court considers the claims against Defendant IT.com below.

### A. Breach of Contract

Plaintiff Yung alleges that the Defendants breached their contracts with him by: (1) terminating him after only one year of employment, (2) failing to give him three percent of IT.com stock, (3) failing to reimburse his travel expenses, and (4) refusing to pay him wages for December 12, 2006, to December 31, 2006. The Defendants move for summary judgment on each aspect of this breach of contract claim.

*1. Three-Year Employment Contract*

Yung claims that the Engagement Letter and Restricted Stock Agreement guaranteed him

Case No. 1:08-CV-662
Gwin, J.

three years of employment with IT.com. Defendant IT.com responds that none of the documents on which that Yung relies upon provides support for a three-year term. In fact, IT.com says that the stock agreement actually confirms that Yung was terminable at will.

"There is a presumption that a hiring not accompanied by an expression of a specific term of duration creates an employment relationship terminable at will by either party at any time." [Nickens v. Labor Agency of Metro. Wash., 600 A.2d 813, 816 (D.C. 1991)](#) (citing *Sorrells v. Garfinckel's, Brooks Brothers, Miller & Rhoads, Inc.*, 565 A.2d 285, 289 (D.C. 1989)). This presumption applies unless the parties state clearly their intention to limit the employer's right to terminate, such as by a contract provision setting out employment for a fixed term or language that allows termination only for cause. [Daisley v. Riggs Bank, N.A., 372 F. Supp. 2d 61, 67-68 (D.D.C. 2005)](#); *see also* [Taylor v. Wash. Metro. Transit Auth., 922 F. Supp. 665, 674 (D.D.C. 1996)](#).

Thus, "[i]n order to rebut the presumption of at-will employment, and proceed with a cause of action for wrongful discharge under a breach of contract theory, 'a plaintiff must provide evidence of clear contractual intent on the part of both the employer and the employee.'" [*Daisley*, 372 F. Supp. 2d at 68](#) (quoting *Lance v. UMW 1974 Pension Trust*, 355 F. Supp. 2d 358, 360 (D.D.C. 2005)).

Here, Plaintiff Yung does not produce sufficient evidence to show that he had a three-year employment contract. First, the Engagement Letter says only that Yung's stock ownership will be fully vested after three years, not that he is guaranteed a job until the vesting date. [Doc. [34-5 at 13.](#)] Although the vesting schedule is not conclusive proof of at-will employment, it does not meet Yung's burden to show a clear intention to limit IT.com's right to terminate him.

As to the Restricted Stock Agreement, Cordover did strike out some language from the contract that would have confirmed Yung's at will status, such as a clause providing that IT.com

Case No. 1:08-CV-662
Gwin, J.

would purchase Yung's stock after his dismissal "with or without just cause." [Doc. 34-5 at 4.] This strikeout is largely immaterial, however, because Yung does not make any argument that he was fired without just cause. Instead, he argues that he could not be fired at all for three years. Absent the deletions, the Stock Agreement specifically provides that IT.com could dismiss or remove Yung. Importantly, the agreement also contains an express "at-will employment" provision. [Doc. 34-5 at 9.]

For similar reasons, Yung's new promissory estoppel argument fails as well.[3/] To hold an employer liable on a theory of promissory estoppel, "there must be evidence of a promise, the promise must reasonably induce reliance upon it, and the promise must be relied upon to the detriment of the promisee." *Simard v. Resolution Trust Corp.*, 639 A.2d 540, 552 (D.C. 1994). Thus, "Demonstration of a promise is a prerequisite to invocation of the doctrine of promissory estoppel." *Id.*

Here, Yung points to no evidence of a promise made to him that he would be employed at IT.com for three years. Instead, Yung alleges that "Cordover knew that Yung was operating under the assumption that he would be guaranteed employment with IT.com for 3 years." [Doc. 39 at 14.] The only affirmative statement Yung references is Cordover's promise to "cover some expenses of your move from California to DC." [Doc. 34-5 at 13.] It does not follow, however, that a promise to cover moving expenses can be construed as a promise for a specific term of employment. In fact,

---

[3/]Although the Defendants argue that this Court should reject Plaintiff Yung's promissory estoppel claim outright because he did not raise it in his Complaint, the court of appeals has held that where the factual basis for a party's new claim is "substantially similar" to a claim already alleged, striking that claim is improper. *Wiley v. Glassman*, 511 F.3d 151, 159 (D.C. Cir. 2007). Even under *Tunica-Biloxi Tribe of La. v. United States*, 577 F. Supp. 2d 382, 412 (D.D.C. 2008), on which the Defendants rely, the proper remedy is not to grant summary judgment on the newly-raised claim but instead to dismiss the claim with leave to amend the complaint. Given the similarity of the claims in this case and the inefficiency of granting dismissal with leave to amend at this stage of the litigation, the Court considers the promissory estoppel claim on its merits.

Case No. 1:08-CV-662
Gwin, J.

in *Simard*, the court affirmed summary judgment against the employee on language much more relevant and specific than the language in this case. *See Simard*, 639 A.2d at 544 (affirming summary judgment against employee even though employer stated that "the job . . . would be a stable one and there would be long term . . . possibility for growth and opportunity" and that "we . . . look forward to a long and mutually beneficial relationship.").

Therefore, the Court finds no material evidence to support Yung's claim that he had a three-year employment contract with Defendant IT.com.

*2. IT.com Stock*

In his Complaint, Plaintiff Yung also says that the Defendants owe him three percent of their outstanding shares, as promised in the Engagement Letter. [Doc. 1 at 10, ¶5.] Defendant IT.com, however, says that the company transferred thirty shares of IT.com stock to Yung on January 1, 2006. [Doc. 34-5 at 2.] Moreover, Yung admitted that he received those shares and that he and the Defendant agreed that those shares represented three percent of the company. [Doc. 34-4 at 5.]

Responding to this evidence, Yung shifts focus and argues that the Defendants breached his employment contract by failing to pay him the stipulated value of the IT.com stock. [Doc. 39 at 15.] Although the Engagement Letter makes no promise that the Defendants would purchase Yung's stock, [Doc. 34-5 at 13], the Restricted Stock Agreement does. Specifically, the agreement's "Mandatory Purchase" clause provides:

> In the event of the termination of employment of [Yung] with the Corporation during the three(3)-year period from and after the Effective Date [December 1, 2005] hereof, . . . the Corporation shall purchase (or shall cause its designee to Purchase) the "Applicable Percentage" (as defined below) of the Shares (including, if applicable, fractional Shares) of the Corporation owned by [Yung] . . . at the purchase price and upon such other terms and provision set forth in this Section 2 below.

Case No. 1:08-CV-662
Gwin, J.

[Doc. 34-5 at 4-5.]

No one disputes that Cordover fired Plaintiff Yung within his first three years of employment. Thus, Yung has presented sufficient evidence to preclude summary judgment on the claim that Defendant IT.com breached its contract to purchase his IT.com stock.

*3. Travel Expenses*

Plaintiff Yung further claims that the Defendants breached his employment contract by failing to reimburse him for $7,608.40 in travel expenses. [Doc. 1 at 10.] Yung admits, however, that he did not submit a reimbursement request to IT.com for these expenses. [Doc. 34-4 at 44.]

Nevertheless, the parties' contract does not contain a condition requiring Yung to make such a request. Instead, the Engagement Letter simply says that Defendant IT.com "shall pay the expenses of your visiting California for business reasons at least three times (at your discretion) any time during the next calendar year." [Doc. 34-5 at 13.] Yung has produced evidence that he incurred at least some travel expenses. [Doc. 39-6.] Moreover, the Defendants do not allege that they have in fact reimbursed Yung.

Instead, the Defendants essentially ask the Court to find that Plaintiff Yung was required to make a demand for payment prior to filing this lawsuit. Although this argument makes some intuitive sense, the Court declines to read a demand condition into the parties' contract. Permitting the Plaintiff to proceed on this claim promotes judicial efficiency and does not prejudice the Defendants in any way. *See* 8-31 *Corbin on Contracts* § 31.5 (LexisNexis 2009) ("The suit itself is then often said to operate as the necessary demand. The peculiarity of the case is that the action is not thought to be premature. No doubt the rule operates without injustice, in most cases. For, if the case should be dismissed, another suit could instantly be brought and maintained without any new

Case No. 1:08-CV-662
Gwin, J.

demand.").

Thus, Yung has provided sufficient evidence to preclude summary judgment on this claim.

*4. Oral Contract for December 2006 Wages*

As the final basis of his breach of contract claim, Plaintiff Yung alleges that the Defendants owe him $9,248.92 in wages for December 2006. [Doc. 1 at 10, ¶5.] In moving for summary judgment, Defendant IT.com argues that it paid Yung all wages owed for work performed up through his date of termination, December 12, 2006, and that no written contract requires payment beyond that date. [Doc. 34-2 at 17.]

Responding, Plaintiff Yung claims that he entered into an *oral* contract with Cordover for payment of wages through December 31, 2006, in return for Yung preparing "transition documents" for IT.com. [Doc. 39 at 17.] In support of this contention, Yung states in his declaration that "Cordover and I agreed that I would write up the details of a mathematical algorithm 'horizontal-vertical LDA' that formed the underpinnings of IT.com in exchange for payment of wages through December 31, 2006 . . . I worked on these documents in the days between December 12-19, 2006." [Doc. 39-1 at 2.]

In his deposition, Yung similarly testifies that he spent the week prior to December 19, 2006, writing out three pages of the "technical details" that formed the "underpinnings of the company." [Doc. 34-4 at 38, 43.] Yung further says that he gave these pages to Cordover on December 19, 2006. [*Id.*] In opposing summary judgment, Yung submitted a two-page summary of the algorithm he had created for the company, dated August 18, 2006. [Doc. 39-1 at 2, 39-9.]

Although the Defendants note the discrepancy in the date on the algorithm summary, this discrepancy is not conclusive proof that Yung did not in fact draft most if not all of the summary in

-11-

Case No. 1:08-CV-662
Gwin, J.

December. Moreover, this Court does not weigh issues of credibility on summary judgment.

Notably, the Defendants do not dispute that Cordover entered into an oral contract with Yung. Instead, they argue that Yung cannot raise the argument for the first time on summary judgment. [Doc. 41 at 6-7.] As previously noted, however, where the factual basis for a party's new claim is "substantially similar" to a claim already alleged, striking that claim is improper. *Wiley*, 511 F.3d at 159. Moreover, although Young states in his Complaint that he brings his wrongful termination claim pursuant to a "written agreement," he does not make a similar statement in reference to his salary. Instead, he merely claims that "Plaintiff was owed salary . . . for the month of December 2006." [Doc. 1 at 10, ¶5.] Thus, the Court declines to hold that Plaintiff Yung somehow waived his oral contract claim and finds that Yung has produced sufficient evidence to preclude summary judgment on this claim.

In summary, the Court finds Plaintiff Yung has shown a genuine dispute of material fact on his breach of contract claim for purchase of his stock, reimbursement of his travel expenses, and payment of his December 2006 wages. Plaintiff Yung has not, however, provided sufficient evidence on his wrongful termination in breach of contract claim, and the Court **DISMISSES** that claim.

**B. Wages Due**

In count two of his Complaint, Plaintiff Yung seeks unpaid wages for December 2006 pursuant to the D.C. Payment of Wages Act, D.C. Code § 32-1301 *et seq.* (2009).[4/] In their motion for summary judgment, the Defendants argue that the Act does not cover Plaintiff Yung because he

---

[4/]Although the Plaintiff's Complaint does not specify the law supporting his wage claim, in opposing summary judgment, Plaintiff Yung states that D.C. Code § 32-1303(1) provides his right to recover the wages at issue. [Doc. 39 at 19.]

Case No. 1:08-CV-662
Gwin, J.

worked in a "professional capacity."

The section of the Act under which Plaintiff Yung seeks relief applies only to "employees." [Id. § 32-1303(1)](). The Act defines an employee as: "any person suffered or permitted to work by an employer except any person employed in a bona fide executive, administrative, or professional capacity (as such terms are defined and delimited by regulations promulgated by the Council of the District of Columbia)." [Id. § 32-1301(2)]().

In turn, the D.C. Municipal Regulations define "professional capacity" as an employee who[se]:

> (1) Primary duty must be either (a) work requiring knowledge of an advanced type in a field of science or learning. Usually obtained by a prolonged course of specialized instruction and study or (b) work that is original and creative in character in a recognized field of artistic endeavor and the result of which depends primarily on his or her invention, imagination, or talent or (c) work as a teacher certified or recognized as such in the school system or educational institution by which he or she is employed; and
>
> (2) Consistently exercise discretion and judgment; and
>
> (3) Do work that is mainly intellectual and varied, as distinguished from routine or mechanical duties; and
>
> (4) Must not spend more than 20 percent of his or her workweek on activities not essentially a part of and necessarily incident to professional duties; and
>
> (5) Paid on a salary or fee basis at a rate of not less than $170 a week.

[D.C. Mun. Regs. tit. 7](), § 999.1(2010).

As an initial matter, the parties do not dispute that Plaintiff Yung satisfies the first, third, fourth, and fifth elements of the exemption. Reviewing the record, the Court finds no evidence to the contrary. For example, the parties agree that Yung holds a Ph.D. from Stanford University in statistics and machine learning, a Master's degree from Stanford in statistics, and a Bachelor's

-13-

degree from the Massachusetts Institute of Technology. In addition, the parties agree that IT.com hired Yung to be its director of research or "chief scientist" and to oversee and develop a complicated algorithm for the company's new search engine product. Moreover, IT.com paid Yung an annual salary of $110,000.

The parties do dispute whether Yung "consistently exercised discretion and judgment." On this issue, Yung himself testified, however, "My title was chief scientist, but I was actually doing a lot more. I was the main guy in charge. Mark Cordover was not technically savvy, so he let me run the show." [Doc. 34-4 at 51.] In fact, the probation letter Cordover sent Yung two days before his termination actually indicates that if anything, the Company believed Yung had too much discretion: "I need you to cooperate with IT.com in the production of our products, and by cooperation I mean on my terms, with my direction. Answering to our needs insofar as the leader of our technological development can." [Doc. 39-7.] Thus, the Court finds no material dispute that Yung satisfies the second prong of the professional capacity exemption.

Because Yung worked in a "professional capacity," the Payment of Wages Act expressly exempts him from its coverage. Accordingly, the Court **GRANTS** the Defendant's motion for summary judgment on Plaintiff Yung's Wage Act claim.

### C. Conversion

Plaintiff Yung also alleges that the Defendants converted his laptop computer when Cordover confiscated it from him on December 11, 2006. [Doc. 1 at 11, 39-1 at 1.] The Defendants move for summary judgment on this claim, arguing that Yung provides no evidence that he owned the computer.

Conversion is "any unlawful exercise of ownership, dominion or control over the personal

Case No. 1:08-CV-662
Gwin, J.

property of another in denial or repudiation of his rights thereto." *Curaflex Health Servs. v. Bruni, P.C.*, 877 F. Supp. 30, 32 (D.D.C. 1995) (citing *Duggan v. Keto*, 554 A.2d 1126, 1138 (D.C. 1989)).

In this case, the parties dispute which of them owns the laptop computer. IT.com founder Cordover says that Jason Pratt, IT.com vice president, purchased three MacBook Pro laptop computers for the company on March 27, 2006. [Doc. 34-3 at 3.] The Defendants also submit an electronic receipt from the Apple Store for the three laptops, showing that vice president Pratt purchased the computers and had them shipped to IT.com's business address. [Doc. 34-3 at 7.] Plaintiff Yung also testified at his deposition that after his termination, he admitted to Cordover that IT.com owned the laptop. [Doc. 34-4 at 39.] Yung claims, however, that he made that admission out of fear that Cordover would otherwise destroy the laptop and its contents. [*Id.*]

Although Plaintiff Yung admits that IT.com purchased the computer, [Doc. 34-4 at 41], he says that Cordover told him that he could keep it. [*Id.* at 41-42.] Plaintiff Yung also points to a service receipt, showing that he sent the laptop for service in June 2006 and requested that it be returned to his home address in California. [Doc. 39-8.] In addition, Yung says that the laptop contains some of his personal files as well as software he purchased. [Doc. 39-1 at 1.]

Given these conflicting assertions, the Court finds that a genuine dispute of material fact exists as to the ownership of the laptop. Accordingly, the Court **DENIES** the Defendant's motion for summary judgment on Plaintiff Yung's conversion claim.

### D. Fraud

Finally, Plaintiff Yung alleges that the Defendants committed fraud by promising him a three-year term of employment with no intention of performing on that promise. [Doc. 1 at 12.] The Defendants move for summary judgment on this claim, arguing that there is no evidence it made

-15-

Case No. 1:08-CV-662
Gwin, J.

such a promise or that IT.com founder Cordover intended to break the promise when he allegedly made it. [Doc. 34-2 at 22-23.]

To make out a fraud claim in the District of Columbia, Yung must prove: (1) a false representation or willful omission in reference to a material fact, (2) made with knowledge of its falsity, and (3) with intent to induce the party to rely on the representation or omission, where (4) the party relies upon the representation or omission, (5) to his detriment. *Bell v. Rotwein*, 535 F. Supp. 2d 137, 144 (D.D.C. 2008).

In support of his fraud claim, Plaintiff Yung points only to an email he sent to IT.com founder Cordover while negotiating his compensation package. Yung told Cordover: "I would like to earn 5% of the company over 5 years. Currently, you offer me 3% over 3 years, but I want to consider a longer horizon." [Doc. 34-5 at 15.] Ultimately, the parties settled on three percent with a three year vesting schedule, as set out in the Engagement Letter. [*Id.* at 13.]

As an initial matter, Yung's fraud claim is merely a recasting of his wrongful termination in breach of contract and promissory estoppel claim, which the Court has dismissed *supra*. *See Morris v. Buvermo Props.*, 510 F. Supp. 2d 112, 119 (D.D.C. 2007) (granting summary judgment to employer where former employed alleged that executive misrepresented that employee had ten-year employment contract). Moreover, Plaintiff Yung points to no statement made *by IT.com* outside his employment contract that was false and made with knowledge of its falsity. Instead, Yung relies only on his own statements to Cordover. In addition, even if Cordover had promised Yung a three-year employment contract, Yung provides no evidence that Cordover did so without intending to keep that promise.

Because Plaintiff Yung has not shown that a genuine dispute of material fact exists as to his

Case No. 1:08-CV-662
Gwin, J.

fraud claim, the Court **GRANTS** the Defendant's motion for summary judgment on that claim.

### IV. Conclusion

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** the Defendants' motion for summary judgment.

IT IS SO ORDERED.


Dated: March 15, 2010          *s/          James S. Gwin*
                               JAMES S. GWIN
                               UNITED STATES DISTRICT JUDGE